## BATTLE *v.* ANDERS.

### Opinion delivered October 30, 1911.

1. DEEDS—DELIVERY—WHEN QUESTION OF LAW.—It is only where the acts or words of a grantor unequivocally evince his intention to make a delivery that the question becomes one of law.  (Page 431.)

2   SAME—EVIDENCE OF DELIVERY—CONCLUSIVENESS OF CHANCELLOR'S FINDINGS.—Where there was testimony tending to show that a grantor never intended to part with the control over deeds executed by him to his daughters and handed to his son, and that the son returned the deeds to the grantor, a finding of the chancellor that there was no delivery will be sustained.  (Page 433.)

Appeal from Hempstead Chancery Court; *James D. Shaver,* Chancellor; affirmed.

#### STATEMENT BY THE COURT.

Georgia W. Anders and Mary, D. Cornelius instituted this action against W. M. Stroud, Lucy D. Battle and Ella Knotts in chancery court, alleging that both plaintiffs and defendants are the children and heirs-at-law of Isaac B. Stroud, deceased. That he had lived in Hempstead County, Arkansas, and was the owner of about two hundred and fifty acres of land on which he resided.   That he made a deed to each of his five children to a certain parcel of land, but the deeds were never delivered. They prayed that said deeds be declared null and void, and that the court would partition the lands among the heirs.

William M. Stroud answered, admitting the execution of the deed to himself and stating that same had been delivered to him.   That he had entered into possession of said land, and had accepted same as his share of his father's estate.

The defendants, Lucy E. Battle and Ella Knotts, filed their answer, alleging that their father had made the deeds to them, and had delivered them to their brother, William M. Stroud, for them.   The facts are as follows:

On the 23d of April, 1904, Isaac B. Stroud made a deed to his son, William M. Stroud, to a certain parcel of his land, and acknowledged the same before W. M. Wallis, justice of the peace. On the same day he signed a deed to each of his four daughters, plaintiffs and defendants in  this action, and acknowledged the same before H. A. Reece, justice of  the peace.   The deeds were in the usual form of warranty deeds used in this State,

and each of the deeds to his daughters, after the warranty clause, contained the following: "This deed is not to be delivered until after my death."

Some time after, in March, 1908, Isaac B. Stroud went out to the field where his son, William M. Stroud, was at work. He had an envelope which he opened, took out a deed, and gave it to his son. He told his son that he was at work on the place, and he wanted him to have his deed then. He delivered the deed to his son, and soon afterwards his son had it recorded. With reference to the other deeds, his son, William M. Stroud, testified as follows:

"When my father took my deed out of the large envelope, he sealed it again and handed it to me, saying that it contained deeds for my four sisters. He said if, I outlived him, he wanted me to take the deeds and give them to my sisters after his death. He delivered the package to me, and I took it and put it in my coat pocket. I went to the house with him, and told him that I had no good place to preserve the deeds, and asked him if it would not be better to put them in the trunk, and let them remain there. He said it would be all right. I went with him to the trunk, and he opened a little box or receptacle which had a drop lid, and it was empty. I remarked that this would be a good place to keep the deeds, and put them in it. He said to me, 'If you outlive me, I want you to attend to this and before you take me out of this house after I am dead, I want you to get these deeds.' He locked the trunk, and put the key in his pocket. The next morning after his death, which occurred in March, 1910, I told my sister, Ella, to get the key to his trunk, which she did, and we went to the trunk together. I unlocked it, and she started to look in the bottom part of the trunk. I told her I thought I knew where the deeds were. I opened the little receptacle where I had placed them, and found the package containing the deeds. The deeds were afterward delivered to my sisters." On cross examination, he said: "I considered at the time I put the deeds in my father's trunk that if anything should happen to them he would be responsible for them. I did not consider myself responsible for them. I did not change the deeds in any way, and the first time I ever even saw the face of the deeds was after my father's death." Some time in the year 1909 my

father and I were talking about the high price of land.  I told him that I would rather have what I could sell my land for in money than have the land.  I also told him that I would not sell as long as he lived unless he sold too.  I asked him if he would list his land to sell if I would list mine.  He said that he already had his business fixed up.  He then went to town, and listed his land for sale with a real estate agent.  When he came back, he said that he did not care about selling it.  That he had his business fixed just like he wanted it; but if a person came along who was fool enough to give the price he asked he was fool enough to take it."

Ella Knotts was a widow, and lived with her father something like fourteen years before his death.  Lucy E. Battle lived with her father until her marriage in November, 1909.  They both testify that their father told them that he made the deeds to them, and that his son, Manson, would attend to all the business after his death, and see that they got their deeds.  They said they knew the deeds were kept in their father's trunk, and that he carried the key to it.  The key to the trunk was found in his pocket after his death.

H. A. Reece testified that he wrote the deeds to the four daughters, and took the acknowledgments as justice of the peace.  He identified the deeds to Georgia E. Anders and Mary D. Cornelius, and said that the deeds to them had been so changed as to make an exchange of grantees, and that this had been done since he took the acknowledgments.  He also stated that Isaac Stroud told him, a month or two before his death, that he wanted to make some changes in the deeds.  He told Stroud that if the deeds were changed they would have to be acknowledged again; that he was no longer a justice of the peace, and could not take the acknowledgments.

The plaintiffs, Georgia W. Anders and Mary D. Cornelius, both testified that their father, about the time of their sister Lucy's marriage, told them that he was going to sell his land and buy a smaller place.  They also testified that after their father's death they asked their brother, Manson, if he had changed the deeds, and he replied that he did not; that he had never seen them until after his father's death.

George W. Crews testified that Manson Stroud told him that he never had the deeds in his possession until the morning

his sister, Ella, gave them to him after his father's death. Manson Stroud denies that he had told any one that he had never had the deeds in his possession until after his father's death. He said that he had told his sister that he had never read the deeds until after his father's death.

The chancellor found that the deed to W. M. Stroud was delivered, and that W. M. Stroud accepted it as his share of his father's estate. The chancellor also found that the deeds to each of the four daughters were never delivered, and rendered a decree cancelling the deeds as a cloud on the plaintiffs' title. The defendants Lucy E. Battle and Ella Knotts have appealed.

*J. O. A. Bush,* for appellants.

Delivery of a deed by a grantor to a third person to be held by him and delivered to the grantee after the grantor's death operates as a valid delivery. 13 Cyc. 569; 54 L. R. A. 871 and note; 4 L. R. A. (N. S.) 816 and note; 123 Ind. 121; 81 Mich, 112; 141 Ind, 318; 110 Cal. 1; 171 Pa. St. 479; 5 Ballard's Law of Real Prop. § 142; 6 *Id.* 174; 7 *Ib.* 130; 8 *Ib.* 138; 9 *Id.* 131; 10 *Id.* 112; 12 *Id.* 76. If verbal instructions are given not to deliver a deed until after the grantor's death, and delivery so made is valid, there in no principle of law that would make such a direction written or printed in the deed itself repugnant to a valid delivery. Evidently the grantor here intended to retain possession and right of enjoyment of the estate during his lifetime and that the grantees should have the remainder. 50 Ark. 367; 9 L. R. A. (N. S.) 317; 130 Mich, 29. When a deed is left with a third person with unconditional directions to deliver it to the grantee after the death of the grantor, it is a deed *in praesenti* and conveys the title to the land immediately, subject to the life estate of the grantor. 16 Cyc. 567 and note 51; 54 L. R. A. 865 and note on page 903; 98 Cal. 446; 35 Barb. 341; 2 Ohio N. P. 287: 41 L. R. A. 265; 38 L. R. A. 239. The surrender and destruction of a deed, once delivered, does not revest the title. 21 Ark. 80; 33 Ark. 62; 34 Ark. 503; 42 Ark. 170; 52 Ark. 493; 53 Ark. 509.

Any disposal of a deed, accompanied by acts, words or circumstances which clearly indicate that the grantor intends that it shall take effect as a conveyance, is a sufficient delivery. 77 Ark. 89. In this case, even if the act of placing the deed

in the grantor's trunk be construed as a return of it to him, that does not alter the case, for the delivery of the deeds by the grantor was complete.   119 Mich. 106; 190 Pa. St. 308; 160 *Id.* 336; 46 Tex. 556; 74 Ark. 117.

*Steve Carrigan, Jr.,* for appellees.

· The presence in each of the deeds of the words, "This deed not to be delivered until after my death," taken in connection with the proof in the case, makes it clear that the maker did not intend to convey any present estate in the lands, any vested right or interest, but that they should be revocable during his life.   The character of the instruments was thereby changed from that of a deed to that of a will.   65 Ala. 301; 66 Ga. 127. Falling in the class of wills, the instruments must fail for want of conformity with the statute of wills.   75 S. W. 677; 80 N. W. 1086; 88 N. E. 231.

If construed as deeds, they must fail for the reason that delivery was made impossible by the terms of the instruments themselves.   Delivery is essential to the validity of a deed. 13 L. R. A. 64.   The question of delivery is one of intention.

If the grantor handed the instruments to W. M. Stroud with instructions as to what to do with them in case of his death, that of itself did not constitute delivery unless the grantor at the time intended it as a finality.   74 Ark. 119; 77 Ark. 92; 136 S. W. 172; 75 S. W. 677; 84 N. E. 638; 41 N. E. 1007; 119 Am. St. Rep. 18.

To constitute a void delivery of a deed, the grantor must part with possession and all dominion over it, as well as relinquish all right to further retain it or power to revoke it.   13 L. R. A.  65; 70 U. S., 636; 3 L. R. A. (N. S.) 648; 177 Ill. 409; 34 N. H. 460.

HART, J., (after stating the facts).   The only issue raised by the appeal in the case is, whether or not the deeds were delivered, and this is ordinarily a question of fact to be determined by the intent of the grantor, as manifested by his acts or words or both.   It is only where the acts or words unequivocally evince the purpose of the grantor that the question of delivery becomes one of law.   *Cribbs* v. *Walker,* 74 Ark, 104; *Russell* v. *May,* 77 Ark. 99; *Eastham* v. *Powell,* 51 Ark. 530.

Manson Stroud said that his father delivered the deeds to him in the field, and told him that if he outlived him he wanted

him to take the deeds and give them to his sisters after his
father's death.   They went back to the house, and he suggested
to his father that he had no place to preserve them.   It was
then decided that the deeds should be placed in his father's
trunk, and his son opened the little box in the trunk, and placed
the deeds in it.   The deeds remained there until his father's
death, and were then delivered by his son to the grantees.
This evidence tended to show that Isaac B. Stroud intended
to and did, in delivering the instruments to his son, part with
the possession of the deeds and all his dominion and control
over them; and if there was no other evidence, it would be
sufficient to establish the fact that the delivery to Manson
Stroud was irrevocable.   On the other hand, the evidence on
the part of the plaintiffs was sufficient to authorize the infer-
ence that the deeds were turned over to Manson Stroud as
agent of his father, and that they could be revoked by him at
will, and that they were afterwards recalled by him.   The
important question in determining whether there has been a
delivery is the intent of the grantor that the instrument should
pass out of his control and operate as a conveyance.   The
intent of the grantor is to be inferred from all the facts and
circumstances adduced in the evidence.   His acts and con-
duct are to be regarded in ascertaining his intent.   It will
be remembered that the act of first handing the deeds to Manson
Stroud in the field, and their going to the house, and putting
the deeds in the trunk of the father upon the suggestion of the
son that he did not have a safe place to keep them was all
practically one transaction.   Then, too, the deeds contained a
clause that they should not be delivered until after the grantor's
death.   Manson Stroud testified that he did not consider
that he would be responsible for the deeds if they should become
lost.   H. A. Reece, justice of the peace, who wrote the deeds
and took the acknowledgment to them, testified that a month
or two before Isaac B. Stroud's death he came to him for the
purpose of having the deeds changed, but that the deeds were
not changed because he told Stroud that they would have to
be acknowledged again, and that he was no longer a justice
of the peace.   It was also shown that Stroud placed the lands in
the hands of a real estate agent for sale, and told his son that
he would sell the land embraced in the deeds to his daughters
if he could get his price for them.

While it is denied by Manson Stroud, Crew testified that Manson told him that he had never had the deeds in his possession until after his father's death. The acts and conduct of Isaac B. Stroud, when taken in connection with the other facts and circumstances of the case, tend to show that Issac B. Stroud never intended to part with his control and dominion over the deeds. That they were turned over to his son to be held for him subject to his recall, and that the deeds in the son's hands were in the father's hands.

It must be admitted that the question of delivery under all the evidence is a very close question of fact, but it is in the very class of cases that the finding of the chancellor has persuasive effect upon us. It is the long established and settled rule of this court that the facts found by the chancellor will not be disturbed on appeal, unless they are against the clear preponderance of the evidence. We have recited the material facts in our statement of the case, and have carefully read and considered all the evidence. When all the facts and circumstances are considered in the light of each other, we can not say that the finding of the chancellor is against the weight of the evidence.

The decree will therefore be affirmed.