## DAVIS *v.* DAVIS.

### Opinion delivered February 23, 1920.

1. DEEDS—DELIVERY.—To constitute delivery of a deed, there must be an intention to pass title to the land conveyed immediately, and that the grantor shall lose dominion over the deed.

2. DEEDS—INSUFFICIENCY OF DELIVERY.—Evidence *held* insufficient to establish delivery of a deed.

3. DESCENT AND DISTRIBUTION—RIGHT OF HEIRS TO SET ASIDE FRAUDULENT CONVEYANCE.—Under Kirby's Digest, section 81, providing that an administrator of a grantor may sue to set aside a fraudulent conveyance by him, the heirs of such grantor may defend a suit by the fraudulent grantee to recover possession of the land so conveyed.

Appeal from Stone Chancery Court; *W. R. McIntosh,* Special Chancellor; affirmed.

STATEMENT OF FACTS.

Appellants brought this suit in equity against appellees to compel appellees to deliver to them a deed to certain lands comprising about 1,300 acres, and for the possession of said lands.

Appellees deny that the deed had ever been delivered or that the appellants were the owners of, or entitled to the possession of the lands in controversy. By way of cross-complaint they allege that appellants and appellees are the heirs at law of W. E. Davis, deceased, who died owning and in possession of said lands; that appellee, W. A. Davis, was appointed administrator of his estate, and that there is no necessity for any further administration. They pray that the lands be divided between the widow and heirs of said W. E. Davis, deceased.

According to the testimony of William A. Davis, one of the appellants, he was a son of R. M. Davis, who died in Stone County, Arkansas, in March, 1915. The lands in controversy consist of two farms, one of, which is known as the McDermott place and is located near Penter's Bluff in Stone County. The other is called the Jones bottom farm and is located near Guion in Stone County. R. M. Davis occupied one of the farms in controversy at the time of his death and had lived there with his family for about 16 years. The annual rental value of each of said farms was about $2,500. After the death of his father, witness and his brothers and sisters continued to occupy said lands until about January 1, 1916. At this time they moved to another farm in Stone County which they owned. This farm was only about one-fourth as large as the one from which they moved. W. E. Davis, the uncle of witness, died in July, 1917. After his death a deed was found in his safe to R. M. Davis to the lands in controversy. The witness, his mother and his brothers and sisters made a formal demand of the administrator of the estate of W. E. Davis, deceased, for this deed and upon the refusal of the administrator to deliver possession of the same to them, they instituted this action.

The administrator of the estate of W. E. Davis, deceased, was a witness for appellants. According to his testimony he was a brother of the whole blood of R. M. Davis and of the half blood of W. E. Davis. After the death of his brother, W. E. Davis, he was appointed administrator of his estate. When he opened the safe of his brother he came into possession of a deed purporting to be from W. E. Davis to R. M. Davis to the lands in controversy. Upon the advice of his attorney he refused to deliver this deed to the children and heirs at law of R. M. Davis, deceased.

According to his testimony he was at the home of his brother, W. E. Davis, in July, 1902. He was in the house and R. M. Davis came in and said that W. E. Davis wanted to talk to them. W. A. Davis went with his

brother, R. M. Davis, to the barnyard where W. E. Davis was. He saw R. M. Davis pay some money to W. E. Davis. They told him there was $12,000 in money in the package, and that W. E. Davis had sold the lands in controversy known as the McDermott place and Jones bottom farm to R. M. Davis. W. E. Davis handed the deed to R. M. Davis, who held it a little while and handed it back to W. E. Davis. About an hour after this W. A. Davis went back into the barnyard and found a pocketbook containing some money. W. E. Davis again came along and counted the money and said there was $12,000 in the pocketbook. He then handed a deed from himself to W. A. Davis to other lands in consideration of the $12,000 which he said was in the pocketbook. W. A. Davis held this deed in his hands a little while and gave it back to W. E. Davis. W. E. Davis told his brothers not to say anything about the transaction; that it wasn't anybody else's business.

On cross-examination W. A. Davis admitted that at the time of the transaction in question W. E. Davis had a damage suit for a large amount of money pending against him and was very much afraid that he would lose it. He said, however, that W. E. Davis told him and his brother, R. M. Davis, that he wanted the deeds to stand. At that time R. M. Davis was indebted to W. E. Davis, and W. A. Davis did not know where he got the money which he handed to his brother at the time of the transaction in question. R. M. Davis lived on one of the places as a tenant of W. E. Davis at the time. He continued to reside there as a tenant of W. E. Davis until the date of his death and never at any time claimed to own the lands. He never had possession of the other farm at all. The farms continued to be assessed in the name of W. E. Davis, and he collected the rents and paid the taxes on them. W. A. Davis never claimed the farm described in the deed from W. E. Davis to him and afterward purchased a small quantity of the lands embraced in the deed and paid his brother for them.

The widow of W. E. Davis testified that she had been married to him for 49 years and that they had never had any children; that she signed the deeds in question because her husband told her it was necessary to make the deed so that in the event they got an unjust judgment against him that his brothers could protect him from being ruined by it; that her husband told her that he would never give up the deeds or turn them over to his brothers unless they did get judgment against him; that her husband kept the deeds in his safe up until the time of his death and kept possession of the lands in controversy; that no one ever disputed their ownership in the lands up to the date of her husband's death; that her husband paid the taxes on the lands up to the time of his death; that her husband got out of the trouble he was in two or three years afterward in 1905 or 1906.

Mark R. Davis, a brother of W. E. Davis, deceased, testified that W. E. Davis was sued for a large sum in damages in 1902, and executed a deed to him to some of his lands in order to protect himself against judgment in the damage suit; that W. E. Davis retained the deed in his possession and kept possession of the lands until he died.

Other witnesses for appellees testified that W. E. Davis remained in possession of the lands up until the time of his death, and that R. M. Davis had stated to them that he had no claim to any of the lands he occupied; that he was renting them from his brother.

It was shown that about the same time that W. E. Davis signed the deed in controversy he executed other deeds to other portions of his lands and that the purpose of executing them was to protect himself from a pending damage suit for a large amount. It was also shown that W. A. Davis, the administrator, had stated that his brother had executed the deed in question in this case as well as the one to himself for the purpose of protecting himself against an unjust judgment in a damage suit which was pending against him at the time.

Other testimony will be referred to in the opinion. The court found the issues in favor of appellees, and the complaint of appellants was dismissed for want of equity. The court further found that Catherine H. Davis was the widow of W. E. Davis, deceased; that they had no children and that by law she was vested with the title to an undivided one-half of all his lands in fee simple; that W. E. Davis had 13 brothers and sisters, and that those surviving and the children of those deceased before him were entitled to share equally in his estate. A decree was entered accordingly.

The case is here on appeal.

*Elbert Godwin,* for appellants.

1. The deed was made, executed and acknowledged, as the testimony shows. Not a single witness or circumstance contradicts the written admission of appellee W. A. Davis, the testimony of Mrs. C. H. Davis and that of Ed Grigsby. 23 Ark. 444. The deed is valid on its face, and no question is raised by appellees in their pleadings or testimony as to the form or substance of the deed.

2. The deed was not delivered, as it was found in the grantor's safe, among his papers, and the presumption is that it was not delivered. 74 Ark. 104; 134 *Id.* 380. Delivery depends upon the intention of the grantor. 77 Ark. 89; 100 *Id.* 427; 15 *Id.* 519; 74 *Id.* 104; 97 *Id.* 283.

3. If the undisputed evidence is true, the grantor, W. E. Davis, lost control of the deed when he gave it to grantee, R. M. Davis, and there was complete delivery. The acceptance of a deed for the benefit of a grantee will be presumed. 77 Ark. 89; 97 *Id.* 283; 63 *Id.* 374; 54 L. R. A. 997, and note. All the presumptions of law and fact show an acceptance and delivery of the deed.

4. If the title passed by the deed, the destruction or surrender of the deed to Emanuel Davis by R. M. Davis did not revest the title in the grantor, 21 Ark,

80; 34 *Id.* 503; 80 *Id.* 8; 43 *Id.* 203; 42 *Id.* 170; 52 *Id.* 493; *Ib.* 509; 80 *Id.* 8.

5. The deed was not a fraudulent conveyance, but, if so, appellees were not entitled to recover. 10 Ark. 54; 19 *Id.* 650; 67 *Id.* 325; 47 *Id.* 301; 52 *Id.* 171. The fraudulent grantee gets a title that he can alienate and thus confer title upon his ailienee. 14 Ark. 69; 55 *Id.* 116. See also Bump on Fraud. Conv., § 450; 67 Ark. 338.

6. In view of the law cited, the widow, Mrs. C. H. Davis, is bound and can not be heard to complain that appellants are entitled to judgment for a half interest to the lands claimed by her. The fraudulent conveyance binds the heirs of Emanuel Davis to the other half interest in the lands. 47 Ark. 301; 59 *Id.* 251; 13 *Id.* 593; 10 *Id.* 53; 19 *Id.* 650.

7. The statute of limitations has not barred appellants by reason of adverse possession for more than seven years. There must be notice of the hostility of the vendor's claim. 84 Ark. 520; 69 *Id.* 562; 58 *Id.* 142; 84 *Id.* 52. A declaration by a grantor in a deed purporting to convey an absolute title for a valuable consideration, made subsequent to the execution of the deed in the absence of the grantee, is inadmissible. 79 Ark. 418; 90 *Id.* 149; 134 *Id.* 149; 83 *Id.* 186.

8. No duress or undue influence of W. E. Davis over appellee, Mrs. C. H. Davis, was shown. 95 Ark. 523. Parol evidence was inadmissible to vary or contradict the terms of a deed. 66 Ark. 393; 64 *Id.* 650; 55 *Id.* 347; 50 *Id.* 393; 1 Greenl. on Ev., §§ 257, 271, 281-2. To set aside a deed for undue influence, it is not sufficient that the grantor was influenced by the beneficiary in the ordinary affairs of life or in close touch and upon confidential terms, but there must be a malign influence from fear, coercion or other cause depriving the grantor of his free agency. 78 Ark. 420; 49 *Id.* 367.

9. There was consideration for the deed. In the absence of fraud or mistake parol evidence is not admissible to contradict or vary the terms of a deed. 17

Cyc. 643. Where a deed is absolute on its face no parol conditions or reservations, etc., can be proved to defeat the grant. 21 Ark. 440; 33 *Id.* 150. There is nothing in the testimony or pleadings that the grantor was actuated by any fraudulent representations of the grantee, but he was acting freely, knew what he was doing and was fully aware of the consideration. 2 Pom. on Eq. Jur. (2 Ed.), § 1036; 71 Ark. 497; 125 Ark. 441. Appellees have not pleaded fraud or mistake nor proved it, and the decree should be reversed. 99 Ark. 350; 71 *Id.* 497.

10. As the lands of both farms are described in the same deed, possession of one was possession of all the lands. 133 Ark. 599; 202 S. W. 107; 135 Ark. 321; 204 S. W. 755; 134 Ark. 548; 204 S. W. 424.

*E. G. Mitchell,* for appellees.

The deed is absolutee on its face, and there are no conditions or reservations in it. It was lost sight of for many years but found among the grantor's papers and this was *prima facie* evidence that it was never delivered. 74 Ark. 104, 120. Delivery with intention to pass title to the grantee is essential. 1 Devlin on Deeds (last Ed.), § 260. It must pass beyond the grantor's control. *Ib.* 260, A; 98 Ark. 471; 8 R. C. L. 985. As to delivery, see 1 Devlin on Deeds (last Ed.), §§ 262, 289; 8 R. C. L. 978. And the deed must be accepted by the grantee to pass title. 1 Devlin on Deeds, § 289; 13 Cyc. 470; 80 Ark. 8.

W. E. Davis controlled the lands, collected rents, paid taxes until his death, more than 15 years, with the full knowledge of R. M. Davis, who made no objection and no claim of ownership, and his actions and conduct are inconsistent with any claim of his or his heirs. Cyc. 748; *Ib.* 746; 55 Ark. 633; 98 *Id.* 438. On the whole case, the judgment is right and the evidence sustains it.

Hart, J. (after stating the facts). In the first place, it may be said that a preponderance of the evidence

shows that the deed under which appellants claim title to the land in controversy was never delivered. The question of delivery is one of fact to be determined by the intent of the grantor, as manifested by his acts or words or both.

In order to constitute a delivery, there must be an intention to pass the title immediately to the land conveyed, and that the grantor shall lose dominion over the deed. *Battle* v. *Anders,* 100 Ark. 427, and *Bray* v. *Bray,* 132 Ark. 438. Tested by this rule, it is manifest there was no delivery. The deed was never filed for record. It never really left the possession of the grantor. It is true that W. A. Davis testified that his brother, W. E. Davis, handed the deed to R. M. Davis and that the latter kept it a little while before he handed it back; but the accompanying facts show that this was all a mere pretense, and was not intended for an actual delivery of the deed. The uncontradicted evidence shows that W. E. Davis continued in possession of the land, collected the rents and profits therefrom, had them assessed in his own name, and paid the taxes thereon until the date of his death. R. M. Davis never claimed any title to the lands, but on the contrary told various persons that he was renting them from his brother and regularly paid the rent thereon. He had no money with which to pay for the lands and was indebted to his brother at that time. A similar transaction was had between W. E. Davis and W. A. Davis upon the same occasion. W. A. Davis said he found the money in the barnyard of W. E. Davis with which he paid for his land. It is a significant fact that he did not know that he would find the money and that just after he found it he met his brother, W. E. Davis, and showed him the pocket book and the money. W. E. Davis, after counting it, said there was $12,000 in the pocket book and at once tendered him a deed which had already been executed. Neither W. A. Davis nor R. M. Davis had any money at the time. The record shows that W. E. Davis was a wealthy man for that section of the country, and the only reasonable hypothesis is that

he furnished the brothers the money with which to carry
out the pretended sale so that in the event a large judg-
ment was obtained against him in the damage suit then
pending his brothers could hold the lands and pro-
tect him. R. M. Davis and W. A. Davis only held the
deeds in their hands for a little while in the barnyard
when they handed them back to W. E. Davis. He told
them that he would put them in his safe and for them
to say nothing about the transaction. No claim was ever
made by W. A. Davis or R. M. Davis to the lands until
after the death of W. E. Davis. The retention of the
deed by W. E. Davis under the circumstances as disclosed
by the record shows there was no delivery of the deed
by him to R. M. Davis with the intention of passing the
title to the lands and appellants therefore are not entitled
to recover the lands in this action.

For another reason appellants are not entitled to re-
cover. The evidence which we have just recounted as
well as the other evidence in the case shows that W. E.
Davis executed the deed for the sole purpose of protect-
ing the property from a legal liability. In other words,
there was a damage suit for a large amount pending
against him at the time and the practically undisputed
evidence shows that the deed in question was executed
for the fraudulent purpose of placing the property be-
yond the reach of his creditors and for that reason it is
void. But it is contended that appellees are not entitled
to bring suit to set aside this conveyance as being made
in fraud of his creditors. Counsel are mistaken in this
contention. Section 81 of Kirby's Digest provides that
an administrator of a fraudulent grantor may bring a
suit in chancery to have the deed so executed set aside
for the use and benefit of the heirs at law of the fraudu-
lent grantor saving the rights of creditors and purchas-
ers without notice. In construing this statute the court
has held that where the executor of an alleged fraudulent
grantor was the grantee and refused to bring a suit to
set the deed aside, the heirs at law of the grantor have

the right to bring it, making him a defendant. *Moore v. Waldstein,* 74 Ark. 273.

The administrator joined with the heirs at law of W. E. Davis, deceased, in their cross-complaint to the present action; but, even if he had not done so, under the case just cited, the heirs at law might have proceeded without him. If under the statute the administrator and heirs at law could bring a suit to set aside the deed of their grantor as having been executed in fraud of his creditors, it follows that they could defend a suit brought against them for the possession of the lands.

Therefore, the decree will be affirmed.